**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **VIVIAN WILLIAMS,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **Case No. 14 C 3222** |
| ) | |
| **CAROLYN COLVIN, Acting** ) | |
| **Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Vivian Williams seeks review of an administrative law judge's finding that she is

not entitled to Social Security disability insurance benefits. Williams argues that the ALJ

improperly discredited her testimony and the opinions of doctors and other sources in

determining that she was not severely limited by her disabilities. She moves for

summary judgment on these bases. Carolyn Colvin, the Acting Commissioner of Social

Security, opposes Williams's motion and moves to uphold the ALJ's decision. The

Court grants summary judgment in Williams' favor, vacates the ALJ's decision, and

remands the case for further consideration.

### Background

Williams was born in 1960. She submitted a claim for disability insurance

benefits on February 28, 2005, alleging that she become disabled on November 29,

2001. She claimed to suffer from back pain and a variety of psychiatric conditions,

including anxiety and depression. Her request for benefits was denied by the Social

Security Administration on May 30, 2006 and was denied again upon reconsideration on October 25, 2006.

Williams then requested a hearing, which took place on July 1, 2008. During that hearing, Williams testified regarding her back pain and depressed mental state, explaining that her brief bouts of therapy and medication did not seem to improve her condition. She testified regarding her most recent limited work experience with the WeCan program for ex-offenders and as a substitute teacher. She also explained her living situation, specifically, she lived with a family friend but spent several days per week at the residences of her close friend Deborah and her sister. Deborah and Williams' sister each provided her with general assistance, ranging from helping her bathe and get dressed to fixing daily meals.

The testimony elicited at the hearing also covered Williams's medical history. She elaborated on the information in some of her medical records, explaining why she did not seek additional treatment for her ailments or continue with particular physicians or counselors. Williams submitted records from several physicians who treated her over the course of her alleged disability. Among those records was a report from psychiatrist Dr. Levitan, in which he diagnosed her with mixed anxiety-depression, mixed personality disorder with histrionic and borderline features, and a post work-related injury with resultant lower back problems. Dr. Levitan noted that Williams "would have difficulty handling regular work pressure and stress" and that "she could follow and understand instructions but she could not be relied on to retain them." R. 311-12.

After the hearing, the ALJ held the record open for the parties to submit additional medical evidence. In particular, Williams agreed to submit records of her

recent emergency room visit and hospital admission, a report of her treatment from counselor Ms. McCord, and the report of a future psychiatric evaluation. She also agreed to locate and submit records of her prescriptions. The planned psychiatric evaluation did not go forward, and instead Williams saw Dr. Gardner. Dr. Gardner is a licensed psychologist who performed a series of exams and diagnostic techniques on Williams, including a clinical interview, a diagnostic mental status examination, and several tests, including the Wechsler Adult Intelligence Scale-III (WAIS-III), Wide Range Achievement Test-4 (WRAT-4), Beck Depression Inventory-II, Symptom Checklist (SCL-90-R), Westhaven-Yale Multidimensional Pain Inventory, and Minnesota Multiphasic Personality Inventory-2 (MMPI-2). Dr. Gardner concluded that Williams suffered from bipolar 1 disorder, depression, paranoid traits, herniated disks and myofascial syndrome, some combination of which causes her marked limitations in social functioning and mental capacity. Dr. Gardner opined that Williams' "medical and psychiatric problems combine to produce a significant disturbance in psychological functioning." R. 431. She found it "unlikely that Ms. Williams would be able to sustain meaningful employment given the nature of her medical and psychological problems." R. 432. After this examination, Williams' counsel submitted the remaining evidence to the ALJ, and the ALJ closed the record.

The ALJ issued a decision denying Williams's claim on February 2, 2009. The ALJ applied the standard five-step test to find that Williams had severe impairments but was capable of completing certain types of unskilled labor. *See* 20 C.F.R. § 404.1520(4). At step one, the ALJ found that Williams had not engaged in disqualifying substantial gainful activity. At step two, the ALJ found that Williams had severe

impairments of depression, a personality disorder, and a history of complaints of back pain. At step three, the ALJ found that Williams did not have an impairment or combination of impairments that met one of the listed impairments in the regulations. She then determined Williams' residual functional capacity (RFC), finding at steps four and five that Williams could not do her past relevant work but that she could complete unskilled light work.

In finding that Williams' disabilities did not totally preclude her from working, the ALJ discredited the opinion of Dr. Gardner. The ALJ cited Dr. Gardner's apparently limited access to Williams' records and her incomplete information about Williams' work and other activities at the time of the evaluation. The ALJ also pointed to Dr. Gardner's admission that the MMPI-2 test she administered to Williams was partially invalid due to an over-endorsement of symptoms. The ALJ summarized the medical evidence, opinion evidence, and Williams' own testimony, and she used a two-step process to determine whether Williams' testimony was credible. She relied upon similar reasoning to discredit both Dr. Gardner and Williams, again noting that Williams' testimony regarding her limitations was contradicted by her testimony "about her frequent positive social contact with others outside of her apartment, about her recent employment activity, and about her attendance at the Northwestern creative writing program." R. 94.

On review of the ALJ's decision, the Appeals Council found that the ALJ did not give appropriate consideration to the reports of Drs. Gardner and Levitan, both of whom diagnosed Williams with psychiatric disabilities. The Council also found that the ALJ did not consider evidence that supported Williams' claims of back pain. It remanded the case back to the ALJ, directing her to reconsider the matter in light of its comments.

The second hearing took place on April 5, 2010. An orthopedic specialist (Dr. Newman) and a psychologist (Dr. Rozenfeld) testified as medical experts, and Williams once again testified on her own behalf. Much of her testimony from the first hearing remained the same at the second one, although her living situation had changed. Specifically, instead of living with a friend at the Plymouth Court apartment, she lived full time with her friend Deborah.

The ALJ again denied Williams' request for benefits after this hearing. Much of the ALJ's second decision uses the exact same language as her earlier decision. In the second decision, however, the ALJ based her determination at least in part on the testimony of Dr. Newman and Dr. Rozenfeld, finding their opinions more credible than the other evidence and testimony. This time, the Appeals Council denied Williams's request for review. As a result, the ALJ's decision became the final decision of the Commissioner. *Pepper v. Colvin*, 712 F.3d 351, 361 (7th Cir. 2013).

### Discussion

Williams has moved for summary judgment, asking the Court to reverse the decision of the ALJ outright or vacate the decision and remand the matter for a new hearing. The Commissioner has cross-moved for summary judgment, asking the Court to uphold the decision of the Commissioner.

A reviewing court can overturn or remand an ALJ's decision to deny benefits if the ALJ's decision was not based on substantial evidence. *See, e.g.*, *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* Although the ALJ is not required to address every piece of evidence or testimony, she must provide

an accurate and logical bridge between the evidence and her conclusions. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009).

In determining whether a claimant is disabled, an ALJ must follow a five-step process. *See* 20 C.F.R. § 404.1520(4). At the first step, the ALJ considers the claimant's work activity. If the claimant is performing substantial gainful activity, the ALJ will find that she is not disabled. *Id.* § 404.1520(4)(i). At the second step, the ALJ considers the medical severity of the claimant's impairments. If the claimant does not have a severe medically determinable physical or mental impairment that meets the duration requirement in section 404.1509 or a combination of impairments that is severe and meets the duration requirement, the ALJ will find that the claimant is not disabled. *Id.* § 404.1520(4)(ii). At the third step, the ALJ again considers the medical severity of the claimant's impairments and determines whether the claimant has one or more impairments that meet or equal an impairment listed in the regulations and also meet the duration requirement, the ALJ will find that the claimant is disabled. *Id.* § 404.1520(4)(iii). At the fourth step, the ALJ considers its assessment of the claimant's residual functional capacity and her past relevant work. If she can still perform her past relevant work, the ALJ will find that the claimant is not disabled. *Id.* § 404.1520(4)(vi). At the fifth step, the ALJ considers its assessment of the claimant's residual functional capacity and her age, education, and work experience to determine if she can make an adjustment to other work. If she can, the ALJ will find the claimant is not disabled. If she cannot make an adjustment to other work, the ALJ will find that she is disabled. *Id.* § 404.1520(4)(v). At each step in this process, the ALJ must support her findings with substantial evidence and build a logical bridge. *Scott*, 647 F.3d at 739.

Williams argues the ALJ erred at step three and in assessing the credibility and weight to be given to the testimony of several witnesses. Specifically, she argues that the ALJ erred by 1) failing to consider evidence favorable to Williams in determining whether she was disabled; 2) failing to give controlling weight to Ms. McCord or adequately justify the consideration she gave to Ms. McCord; 3) discrediting Dr. Gardner's opinion; and 4) discrediting Williams' testimony. For her part, the Commissioner argues that the ALJ's determinations were reasonable and supported by substantial evidence and should be affirmed.

## 1. The ALJ's determination regarding the condition of Williams' back

Williams argues that her ailments should have proven her presumptively disabled under two listings—Listing 1.04 for back conditions and Listing 12.04 for depression. To meet Listing 1.04, the objective medical evidence must show:

> 1.04  Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord.  With:
> A.  Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);
> or
> B.  Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;
> or
> C.  Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. pt. 404, Subpt. P, App. 1.  In finding that Williams did not meet the standards

set out in Listing 1.04, the ALJ relied entirely on Dr. Newman's testimony. Based on the reasons set out below, this was erroneous.

To support her claim of back injury, Williams submitted several hundred pages of medical evidence. The ALJ did not independently address the medical records in finding that Williams did not meet Listing 1.04, opting instead to rely entirely on the testimony and interpretations of Dr. Newman. Although the ALJ is not required to address every piece of evidence presented, she must confront the evidence that does not support her conclusion and explain why it was rejected. *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004). The ALJ did not do so. She took Dr. Newman's opinion as fact and said nothing about Williams' previous diagnosis of a herniated disk (R. 328) or her positive straight leg test (R. 326), both of which could have satisfied Listing 1.04.

In addition, a close examination of Dr. Newman's testimony reveals that he was not entirely confident in his own analysis. He remarked that the evidence was difficult to analyze because the MRIs on file were "so old." R. 796. In fact, Dr. Newman repeatedly expressed that he was uncertain about the evidence and his ability to analyze it. When asked for his opinion on Williams' condition, he said:

> A: Well, I'm – you know, I'm having a little problem because her MRIs are so old. But she did have an annular tear, which can cause back pain. Could she hold a job that would require her to be on her feet six hours a day? Maybe not. Maybe four hours a day with a lot of restrictions on bending. Pure backache. I didn't ask her if she wears a corset or a brace. But something like this with an annular tear, she's going to have some instability that's coming to manifest itself when she's tired, being on her feet a long time. And will get back pain. It's hard for me to predict, but she did have an annular tear there back in '01. So I would say – I would modify the light work –
>
> Q: Okay.
>
> A: – to four hours a day.

8

R. 796-97.

Dr. Newman also noted that Williams' particular condition—an annular tear—can heal *or get worse* over time. With this in mind, and in view of the fact that the MRI on which Dr. Newman based his opinion was conducted in 2001, nearly a decade before the hearing, it is difficult to see why the ALJ assigned his opinion such great weight. The ALJ stated that Dr. Newman was due "great weight because he is an orthopedic specialist and it was clear from his testimony that he had reviewed carefully all of the relevant medical evidence." R. 18. But the age and condition of the evidence, along with Dr. Newman's expressed uncertainty, indicates this degree of reliance was misplaced.

In sum, because the ALJ relied almost entirely on Dr. Newman's opinion and did not address evidence that did not support her conclusion, her decision was not based on substantial evidence and cannot be upheld.

**2.      The ALJ's determination regarding Williams' psychiatric condition**

The ALJ found that Williams' psychiatric condition did not rise to the level required to meet a listed impairment and did not preclude her from successfully maintaining an unskilled and light job. Williams takes issue with both findings. In particular, Williams contends that the ALJ inappropriately weighed the evidence, discredited Ms. McCord, and favored Dr. Rozenfeld over Dr. Gardner. Williams also contends that the ALJ characterized her life and day-to-day activities in ways that were unsupported by the record. The Court examines each contention in turn.

**a.      Listing 12.04**

Listing 12.04 requires the following, in relevant part:

A. Medically documented persistence, either continuous or intermittent, of one of the following:

    1. Depressive syndrome characterized by at least four of the following:

        a. Anhedonia or pervasive loss of interest in almost all activities; or
        b. Appetite disturbance with change in weight; or
        c. Sleep disturbance; or
        d. Psychomotor agitation or retardation; or
        e. Decreased energy; or
        f. Feelings of guilt or worthlessness; or
        g. Difficulty concentrating or thinking; or
        h. Thoughts of suicide; or
        i. Hallucinations, delusions, or paranoid thinking; or

    [ . . . ]

    3. Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes);

AND

B. Resulting in at least two of the following:

    1. Marked restriction of activities of daily living; or
    2. Marked difficulties in maintaining social functioning; or
    3. Marked difficulties in maintaining concentration, persistence, or pace; or
    4. Repeated episodes of decompensation, each of extended duration;

OR

C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

    1. Repeated episodes of decompensation, each of extended duration; or
    2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
    3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. pt. 404, Subpt. P, App. 1.

In finding that Williams' condition did not meet Listing 12.04, the ALJ pointed to

apparent inconsistencies in Williams' medical records and testimony.  She also gave great weight to the opinion of Dr. Rozenfeld, who observed Williams at the hearing and reviewed her medical records.

The ALJ focused on whether the paragraph B criteria were satisfied.  In doing so, the ALJ made a number of evidentiary and credibility findings that are not supported by the record.  Those unsupported assertions—regarding the credibility of Dr. Gardner and Williams' day-to-day life and activities—are discussed in detail later in this opinion.  In short, the ALJ's finding that Williams did not meet Paragraph B was not based on substantial evidence.

Additionally, the ALJ did not address whether Williams met the requirements of paragraph A.  Based on the ALJ's focus on Paragraph B, one might assume she found that Williams met the requirements of Paragraph A—otherwise, there would be no need to analyze Paragraph B.  Additionally, the objective medical evidence shows that Williams had been diagnosed with bipolar disorder and, as such, she likely met paragraph A.  *See* R. 431.  But the Court cannot rest its decision on its own assumption.  The ALJ is required to explain her reasoning.  The Seventh Circuit has "made it clear that what matters are the reasons articulated by the ALJ."  *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011).  To the extent that the ALJ failed to discuss paragraph A, she erred.

The ALJ similarly failed to meaningfully address paragraph C.  The ALJ's discussion of paragraph C consists in its entirety of a statement that Williams "has not had or needed a structured environment during the relevant time, and her difficulty in her most recent work and education activities was related to problems other than her

alleged impairments of limitations."  R. 20.  But the ALJ did not explain what those other problems were, and Williams' testimony supports a conclusion contrary to the one the ALJ reached:   Williams testified that she could not continue in her jobs because she was depressed and could not focus in a workplace environment.  R. 660, 689.  The ALJ's failure to confront evidence contrary to her conclusion concerning paragraph B, together with her failure to explain her reasoning concerning paragraph C, renders infirm her analysis of Listing 12.04.

### b.     Ms. McCord's opinion

Williams visited licensed clinical social worker Ms. McCord at Northwestern University's Family Institute for therapy four times in 2007.  Throughout the course of their treating relationship, Ms. McCord noted that Williams expressed symptoms of anxiety and depression and used prescribed mental health medications.  Ms. McCord also noted that Williams was unable to pay the fee associated with treatment at the Family Institute.  Though they attempted to find a way to reduce the cost of the services so that Williams could maintain her treatment, they could not come to a mutually acceptable alternative.  Ms. McCord ultimately closed Williams's file in 2008 based on a lack of further contact with Williams.

Ms. McCord prepared several summaries of her appointments and overall treatment relationship with Williams.  In two of these summaries, she diagnosed Williams with recurrent major depressive disorder.  R. 412, 452.  She noted that Williams was "in need of on-going therapeutic services that she is unable to afford" and that her lack of treatment "hinders her ability [to] appropriately address the psychological effects of the various traumas on her functioning."  R. 453.

Though the ALJ cited Ms. McCord's summaries, she did not assign significant weight to Ms. McCord's opinion that Williams suffered from major depressive disorder and had low energy and difficulty maintaining concentration.  Williams argues that the ALJ should have regarded Ms. McCord as a treating source whose diagnosis of major and recurrent depressive disorder satisfied Listing 12.04 and who should have been given controlling weight.  Alternatively, she argues that even if Ms. McCord's opinion was not due controlling weight, the ALJ nonetheless erred by failing to explain the weight she gave to Ms. McCord's opinion.

Under the Social Security regulations, a treating source is entitled to controlling weight if her opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence.  20 C.F.R. § 404.1527(c)(2).  But "treating source" is a term of art.  A treating source must be an "acceptable medical source," which does not include a licensed clinical social worker like Ms. McCord.  *See* 20 C.F.R. § 404.1502 (Defining the term "treating source" as "your own physician, psychologist, or other acceptable medical source . . . "); *id.* § 404.1513 (enumerating licensed physicians, psychologists, optometrists, podiatrists, and qualified speech-language pathologists as the only "acceptable medical sources").  In short, Williams' argument that Ms. McCord should have been granted controlling weight is not supported by the Social Security regulations.

That said, Ms. McCord's findings were entitled to at least *some* consideration.  The regulations allow an ALJ to consider "other sources" like Ms. McCord in determining how severe a claimant's disability is and how it affects her ability to work.  *See* 20 C.F.R. § 404.1513(d).  Though the Social Security Administration has made it

clear that acceptable medical sources are the "most qualified health care professionals," it also directs ALJs to consider evidence from non-medical sources. *See* SSR 06-03p, 2006 WL 2329939, at *5 (Aug. 9, 2006). In particular, the Social Security Administration has ruled that

> [f]or opinions from sources such as teachers, counselors, and social workers who are not medical sources, and other non-medical professionals, it would be appropriate to consider such factors as the nature and extent of the relationship between the source and the individual, the source's qualifications, the source's area of specialty or expertise, the degree to which the source presents relevant evidence to support his or her opinion, whether the opinion is consistent with other evidence, and any other factors that tend to support or refute the opinion.

*Id.*

The ALJ does not appear to have considered any of the factors cited by the SSA in addressing Ms. McCord's opinion. The ALJ ultimately discarded Ms. McCord's diagnoses by failing to analyze them in any meaningful way: she simply stated that she viewed the associated opinions as medical evidence instead of opinion evidence. R. 28. Consideration of Ms. McCord's opinion in accordance with the SSA's guidelines ought to have resulted in giving her opinion meaningful weight. Ms. McCord's opinion was consistent with the great majority of other opinions in the record. Indeed, several physicians, psychiatrists, and psychologists have diagnosed Williams with mental illnesses and prescribed her anti-depressant drugs over the course of the last fourteen years.

The Court notes that Williams makes an argument for Ms. McCord to be considered as a treating source because Williams was unable to afford treatment from a "more traditional medical source." Pl.'s Reply at 9. But the Social Security regulations do not allow for this, and a court cannot make a policy change of this sort on behalf of

the SSA.  In any event, the applicable regulations and SSA rulings already require ALJs to give meaningful consideration to a source like Ms. McCord.  The ALJ's failure to do so—or at least her failure to explain the degree of consideration she did give to Ms. McCord's opinion—is cause for remand.

### b.    Dr. Gardner's opinion

The ALJ discredited Dr. Gardner's opinion that Williams suffered from severe psychological conditions including depression and bipolar disorder.  Instead, the ALJ favored the conflicting opinion of medical expert Dr. Rozenfeld, finding that Williams' psychiatric condition did not cause her the kinds of serious limitations required to establish disability.  Williams argues that the ALJ did not build the requisite logical bridge to explain why she favored the opinion of Dr. Rozenfeld over that of Dr. Gardner. An ALJ "must build an accurate and logical bridge between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings." *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014).

The ALJ said she gave Dr. Gardner's report "little" weight, despite the fact that Dr. Gardner had observed Williams, performed a series of tests on her, and examined her health records.  The ALJ cited a variety of reasons for discrediting Dr. Gardner's report, particularly that Dr. Gardner:

> . . . was not made aware by claimant of claimant's work as a substitute high school English teacher, of claimant's reportedly successful participation in a Northwestern University post-graduate or adult education creative writing program, or of claimant's then relatively recent work activity with ex-offenders.  Claimant also apparently did not disclose to Dr. Gardner her continuing close relationship with a friend who lives in the Uptown neighborhood, and with whom claimant then reportedly was spending about three days and nights per week, or claimant's frequent weekend stays with her sister in the south suburbs.  Those activities by claimant, described at the first hearing, contradict claimant's report to Dr.

15

Gardner that she rarely left home.

R. 19.

The ALJ jumped from listing the purported evidence she relied upon, to announcing her conclusion. She did not explain why the items of evidence she cited led her to believe that the Dr. Gardner's findings were insufficient or incredible. In particular, the ALJ did not explain what effect this purported contradiction had on Dr. Gardner's test results or ultimate diagnoses. At most, it might have discredited Williams' self-report to Dr. Gardner—but it is unclear how much Williams' self-report weighed in Dr. Gardner's diagnoses or, more importantly, why the ALJ assigned it so much weight in her own review. Because the ALJ is required to explain her reasoning, and because she did not do so here, she did not build the requisite logical bridge.

Additionally, the ALJ relied upon Williams' day-to-day life and activities to discredit Dr. Gardner. But the ALJ's characterization of Williams' day-to-day life and activities is unsupported by the record and cannot be upheld on review. Although the Court cannot reweigh a credibility determination that is supported by the record, "if the evidence on which the ALJ relied does not support her conclusion, the decision cannot be upheld." *Blakes ex rel. Wolfe v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003). The ALJ did not accurately characterize or address the short term nature of Williams' involvement in the activities she cited. Nor did the ALJ account for Williams' explanations as to how she was able to participate in the activities. On close examination, the Court cannot see how the evidence the ALJ relied upon supported her conclusion that Williams would be able to function in a work setting.

Based on the Court's review of Williams' testimony, the activities cited by the ALJ

were actually largely unsuccessful. Williams attended Northwestern for only one quarter, without successfully earning any credits. When asked about the program, Williams testified that she was able to briefly participate in it because it was small and relatively independent. She also explained the difference between the master's degree program and a job, testifying, "I cannot focus with an employer . . . in a Master's program, it's an open program for you to kind of do your own thing. And a job, you're given certain things that are requirements . . . you're like a free agent in a master's program." R. 726. Because Williams did not complete the program or earn any credits, and without any evidence regarding the quality of her scholastic endeavor there, calling her involvement in the program successful "stretches the evidence beyond the breaking point." *Larson v. Astrue*, 615 F.3d 744, 752 (7th Cir. 2010).[1]

The ALJ also pointed to Williams' limited recent work history as evidence that might have changed Dr. Gardner's diagnoses had she known about it. But the ALJ did not explain why this was so; she did not build a logical bridge between her recitation of the evidence and her conclusion. This work by Williams was of such limited duration that it is hard to see how it possibly could have mattered. Williams worked for the ex-offender program on a part-time basis for approximately two weeks before she "got depressed again and couldn't focus." R. 660. And she was only called as a substitute teacher "sporadically"—in 2003 and 2005 she served as a substitute only "for a day or two" at a time, and in 2004 and 2006 she did so only once per year. R. 672-73. If

---

[1] The Court also notes that Williams's testimony reflects she believed she was more capable of participating in an educational program than working in a job. Thus her apparent inability to succeed in or complete the educational program affirmatively suggests an *inability* to engage in substantial gainful activity, not the opposite as the ALJ found.

anything, the evidence on these points *supports* Dr. Gardner's finding that Williams "cannot sustain meaningful employment given the nature of her physical and mental problems." R. 431. That aside, given the short and sporadic nature of the activities cited, the Court is "hard-pressed to understand how [claimant's] brief, part-time employment supports a conclusion that she was able to work a full time job, week in and week out, given her limitations." *Jelinek*, 662 F.3d at 812. In sum, the ALJ's reasoning on this point is fatally flawed.

The ALJ also relied on evidence regarding Williams' day-to-day life, pointing to Williams' living arrangement and visiting schedule with Deborah and her sister as evidence to contradict her claim of "never leaving the house," as allegedly reported to Dr. Gardner. Based on this perceived inconsistency, the ALJ not only discredited Dr. Gardner but also discredited Williams herself. But once again, the ALJ stretched the evidence and did not appropriately connect it to her conclusion. First and perhaps foremost, the Court notes that Dr. Gardner's report does not indicate that Williams said she "never left the house." Perhaps the ALJ was alluding to Williams' statement that she "generally remains inside for most of the day." R. 429. But going to a friend or relative's house periodically to receive assistance does not contradict Williams' testimony that she generally stayed inside for most of the day.

Nor does Williams' maintenance of these two relationships contradict Dr. Gardner's findings. In *Larson*, the Seventh Circuit reversed an ALJ's denial of benefits when it was based in part on a finding that the claimant maintained close relationships with friends. The Court found that "Larson's ability to maintain a small number of close friendships [did] not undermine her testimony that she [was] afraid of going out in

public." *Larson*, 615 F.3d at 752. Unlike Larson, Williams does not appear to contend that she is afraid of going out in public, but that is an immaterial difference under the circumstances. In sum, Williams' statement that she generally stays inside is not contradicted by her testimony that once a week, she goes to other people's homes (from which there is no indication that she goes out).

It is apparent that Williams' living situation is somewhat transient. At the first hearing, Williams lived with a family friend on Plymouth Court and visited her friend Deborah and her sister weekly. By the second hearing, Williams was living full time with Deborah. There is nothing in the record to suggest that Williams's level of ability or energy was any different at her sister or friend's house than it was at the Plymouth Court apartment, or that she left their homes any more often than she had left the apartment. And there is no reason to believe that traveling across town once or twice a week in order to be taken care of by her sister negates her former statement in any meaningful way. But even if there *were* reasonable and appropriate inferences to be drawn from Williams' statement and her living situation, the ALJ did not explain them. She merely recited the evidence and her conclusion. This is the opposite of "building a logical bridge."

As a final note regarding Dr. Gardner's report, the Court points out that the ALJ did not address the facts that appear to contradict her determination that Dr. Rozenfeld was more credible. In particular, the ALJ did not account for Dr. Gardner's explanation for Williams' apparent over-endorsement of symptoms or Dr. Gardner's view that the test results were consistent with someone experiencing personality or mood disorders. The ALJ did not analyze the significance of the MMPI-2 or explain which of the

diagnosed disorders an invalid MMPI-2 might affect. The ALJ similarly did not mention the other diagnostic techniques and examinations that Dr. Gardner relied upon. Even if the ALJ was unconvinced by the evidence that cut against her conclusion, she was required to at least confront it. *Indoranto*, 374 F.3d at 474. Because she did not do so, and for the other reasons discussed, the Court concludes that the ALJ inappropriately discredited Dr. Gardner's assessment.

### 3.     The ALJ's assessment of Williams's credibility

The ALJ found that Williams' testimony was not credible for a variety of reasons. There is more than enough to require a remand irrespective of this credibility determination, and the Court has already addressed some of the flaws that Williams cites. For this reason, the Court need not and does not address each of Williams' contentions in this regard. But to provide guidance on remand, the Court will point out some of the more significant errors in the ALJ's credibility determination.

The ALJ found that Williams' testimony related to her psychiatric issues was not credible because she did not seek continuous treatment. It is well established that conservative treatment is not an appropriate basis for an adverse credibility determination, especially when the claimant explains why her treatment was conservative. *Hill v. Colvin*, No. 15-1230, 2015 WL 7785561, at *5 (7th Cir. Dec. 3, 2015); *Beardsley v. Colvin*, 758 F.3d 834, 840 (7th Cir. 2014). Williams testified that she did not seek additional treatment because she could not afford it. The ALJ disregarded this explanation, reasoning that because Williams was a former state employee, she must have known that she could receive free treatment at Stroger Hospital. But when the ALJ asked Williams why she did not go to Stroger for free care,

Williams testified that she had been billed for previous treatment and could not afford to pay an additional bill. In short, the ALJ's understanding that psychiatric care would have been given for free at Stroger Hospital finds no support in the record; it does not appear to have been true in Williams's own case; and if nothing else, the evidence does not indicate that Williams had any reason to believe she could get psychiatric care for free. ALJs are required to consider a claimant's inability to pay for regular treatment and medicine. *Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008). Absent more persuasive evidence that Williams could get free psychiatric care at Stronger and was aware it was available, the ALJ's analysis on this point was erroneous.

Finally, the ALJ found that Williams' testimony was not credible because she had previously worked several jobs. The Court will not repeat here its description of Williams' limited work history, if it can be called that. The bottom line is that this evidence was not such that it would negate Williams's claim of disability or support the proposition that she was able to work full time. Put together with the other errors detailed in this opinion, the Court concludes that the ALJ's findings were not supported by the record and were not analyzed with the requisite level of specificity. As such, the ALJ's decision cannot stand.

## Conclusion

For the foregoing reasons, the Court concludes that the ALJ's decision is not supported by substantial evidence and therefore grants plaintiff's motion for summary judgment and denies defendant's cross-motion [dkt. nos. 22, 30]. The Clerk is directed to enter judgment stating that the decision denying plaintiff's claim for disability benefits is vacated and that the matter is remanded to the Commissioner for further

consideration in light of this decision.  The Court also notes that this is the second time this particular ALJ's decision regarding Williams's claim for disability benefits has been overturned.  Because the record suggests that the ALJ may not be able to evaluate Williams' case fairly, the Court strongly urges the Commissioner to assign a different ALJ to handle any additional proceedings.  *See Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009); *Golembiewski v. Barnhart*, 322 F.3d 912, 922 (7th Cir. 2003).

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  December 28, 2015